As an administrative matter, Justice McDade was unable to join us today, but we will not be deciding the case without her to be listening to oral arguments and then we'll be conferencing the case with oral argument. So Ms. Preston, proceed. Good morning, Your Honor. May it please the court, I am Megan Preston, I represent the Hoyt family in this case. This case relates to the death of Francis Hoyt. He is known as the family of Francis Hoyt, which is often referred to in the transcript as Hoyt Hoyt. At the time of his death, he was 59 years old. He had a very small family. His mother, Mary, was alive at the time of his death and has since passed away. The remainder of his family was his brother, Ray, Ray's wife, Gina, and their daughter, Shelby. Over his lifetime, which also had a number of very close friends, many of them testified in this case and they are also referred to in the record. Mr. Hoyt killed himself Labor Day weekend in 2013. Prior to that, the witnesses, his friends and family in the case testified that he had gone through some difficulties, both professionally and personally. He had broken up with his long-time girlfriend, Louise. He had also suffered some loss related to his trucking business, Hoyt Brothers Trucking. He had recently lost a contract that made up a significant part of his business and had concerns related to that. Over the couple of months before his death, his condition, his mental state then began to deteriorate. His friends all testified that he was depressed. He was prone to bouts of anger, crying. Things got so bad closer to his death that two of his very close friends, Roxanne Hancock, who was also an ex-spouse, and Amanda Horkey testified that they both stopped talking to him because of the anger and adversity expressed recently in phone calls and conversations with the two of them. Things culminated the weekend of Labor Day weekend in 2013. That Thursday beforehand, Mr. Hoyt changed or executed a new will. He changed some bank accounts to be paid on death to certain beneficiaries. He executed a power of attorney for health care in favor of Gentafia and he broke a suicide note along with that same day. Labor Day the following Monday, he was drinking at a bar that he frequented called Shuck's Tavern. He was seen drinking with a number of friends. At some point, he went out into the parking lot and got a handgun from his vehicle and was seen with that in the parking lot. One of his friends, Mr. Stadler, became concerned that he had a handgun in the parking lot of a bar during a time when there were families around. He calmed Butch down to some extent, took him back to his house, stayed with him for a period of time, and at that point he hid his gun from Butch. He, I believe, put it under the seat of Mr. Hoyt's vehicle. Mr. Hoyt then returns to the bar, asks where his gun was. Mr. Stadler then told him where his gun was. Butch went back home sometime that night or early the next morning and took his own gun. We have filed a will contest action on behalf of the Hoyt family related to the will. We subsequently filed a wrongful death and breach of duty claim against Mr. Tapia. The will at issue leaves a 25% interest in the Hoyt brothers' property, the actual building, 25% each to Shelley Hoyt and Greg Hoyt. The other 50% went to Mr. Tapia. Most of the rest of his estate also was left to Mr. Tapia under the will. There's no reference to his mother Mary in the will, not even did they devise her any personal sentimental belongings, despite testimony from her. But she was, at that point, she didn't recognize either of her children, did she? She was in a nursing home? She was in a nursing home, and I honestly can't recall the exact nature of her mental state at that time, but yes, she had been in a nursing home for some time. Isn't the surviving brother indicated that he didn't even tell her about Butch's death? That is correct. I'm sorry, go ahead. There's not even a reference to her, though, with regard to any personal belongings or making sure that she's taking care of the nursing home. I actually don't believe there's any testimony in the record about exactly how her nursing care was being paid for and that sort of thing. One of the other oddities with the will was a device to Jill Williams. She is an individual that nobody in Butch's circle of friends or family has been able to identify. She's never come forward in this case. No one has any clue who this person is, yet she took property under the will. We believe that the evidence showed at trial that Butch lacked the capacity to make the will that he did on August 29th, just a few days before he took his own life. We also believe that there were some evidentiary rulings by the trial court that limited the petitioner's ability to fully present their case to the jury. One of the main issues we have as far as the evidentiary rulings was the motion that Lennie entered related to the Dead Man's Act. The order related to the Dead Man's Act sometimes recited some of the language from the statute. Our position is that, number one, it was overly broad. It is not particularly easy for the parties to follow. It doesn't include all of the exceptions that exist to the Dead Man's Act, and it doesn't clarify exactly to whom that order would apply, how it would apply, and specifically what testimony would be precluded under it. One of the witnesses whose testimony was partially borrowed under the Dead Man's Act was Dr. Gelbort. Dr. Gelbort had treated Butch White for a head injury in 1990. He suffered a traumatic brain injury following a motor vehicle accident. He was in a coma for some period of time. He was hospitalized for a long period of time. Dr. Gelbort testified that the symptoms of anger, depression, those types of emotional distress symptoms were things that Mr. White had experienced back at the time of the motor vehicle accident. He was precluded from testifying regarding the permanency of this type of injury. He was also precluded from some of the testimony regarding the likely effects that Mr. White would experience because of it. This was done – the court had two bases for this ruling. First of all, that some of the opinions – some of the information Dr. Gelbort gathered – maybe his opinion was from the family members who themselves would be borrowed under the Dead Man's Act. This is an incorrect interpretation of the statute because an expert is not limited to only relying upon invisible evidence. And while there are – the justice case which was cited by the respondent in this matter stands for the proposition that an expert cannot give an opinion that is solely based on the invisible evidence in that specific case on evidence borrowed by the Dead Man's Act. In this case, that was not the sole basis for Dr. Gelbort's opinion. And Dr. Gelbort based his opinion on his prior treatment of Butch White, the old medical records from the injury, his experience and training regarding the effects of a head injury and the ability of this type of brain injury to heal or not heal, and also the information provided by a family that suggested to Dr. Gelbort that he was correct in his opinions and that the injury had, in fact, not healed over time and there were still residual effects from the brain injury. So if that – the information from the family had been the sole basis for the opinion, perhaps the court would have been correct. Perhaps the court failed to consider the other information upon which Dr. Gelbort relied in giving his opinions. Another exception to the Dead Man's Act that the court overlooked is once the opponent puts forth evidence, the – an opponent can testify to refute that evidence. So, for example, Louise Shuler testified that Butch was not close to this family and that she had only met his mother once. Once the respondent elicits that testimony, the adverse party has the right to put forth its own testimony in contradiction of the testimony from the respondent. But in that – when your client testified, I know there was an objection about the ruling about him not being able to make a characterization – or only making a characterization and not discussing specific instances, but didn't the trial court – they didn't really rule on that. There was – the ruling was that he would be allowed to characterize his relationship in response to the – you know, sort of in rebuttal to the other statements that were made specifically in this one by Louise. But wasn't it – the response to the objection was saying it didn't have to be a long answer and you'd make sure that Ray knew what he could say, but didn't – was there a specific either offer of proof or something about the specific instances that were going to be outlined or that were not allowed? There was a great deal of conversation back in the judges' chambers, and I honestly don't recall what all was placed on the record, about family time together, seeing Mary at the nursing home together, and that sort of thing. And the ultimate ruling from the court was that Ray Boyd could testify that their relationship was good, and he was precluded from going any further than saying their relationship was good. So I think that leaves a real question, then, for the jury as to what exactly that means and why they couldn't receive any follow-up explaining exactly what that means. Is there a physical relationship? Did they see each other, phone calls, and that sort of thing? And then similarly with Mr. Stimper, Craig Stimper, who's the executor of the Will in this case, and he was also a beneficiary under the Will, he was precluded from testifying under the Dead Man's Act. However, he was actually – we wanted to call him as one of our witnesses. He was an adverse party to us. He was the proponent of the Will in question, and he would only have been precluded from testifying on his own behalf. He's not precluded from testifying when called by an adverse witness, basically in contradiction to his own position. The other area of evidence that we believe the judge improperly excluded from this case is Mr. Takia's fiduciary duties under the Health Care Power of Attorney, and specifically the preclusion of the petitioners from referring to the actual Health Care Power of Attorney and from using the phrase fiduciary duty in reference to Mr. Takia. The Health Care Power of Attorney in and of itself is extremely relevant to Mr. Boyt's state of mind in the days prior to his death, particularly given that it was executed on the same day that the Will in question was executed, and that in itself is only several days before his death. So the petitioners were precluded from telling the jury that this was another step that Mr. Boyt had taken, seemingly planning to kill himself. The Health Care Power of Attorney, I know that Mr. Takia was made aware, or the decedent asked him if he would accept it, but was that delivered to him prior to the death? I actually don't know whether he physically received a copy of the Power of Attorney or if he was just advised of the Power of Attorney. My recollection is that he had a copy in his possession. I assume it was given to him by Butch, but I really don't know that there was evidence in the record that indicated one way or the other whether Butch actually handed him a copy or that was something he received later. But his testimony was that he was aware of it. He knew he'd been appointed and that he accepted his appointment and understood the ramifications of that appointment. And what was a triggering event for him to assume that Power of Attorney? Nothing other than the specific conversation, and that goes to our claims against Mr. Takia of wrongdoing, that he was aware that he had his agency under the Power of Attorney. He was aware, seemingly, that Butch intended to kill himself or had a mental capacity that indicated he might kill himself. Mr. Takia admitted to the police officer investigating the scene that he was concerned that Butch would do something horrible, yet he took no action under the Power of Attorney to help Mr. Hoyt get any medical care. So you're saying that that Power of Attorney, when it was executed, it wasn't like a general, you know, in the event I can't take care of myself, then you're going to make these decisions. You're saying that it was, in effect, the day that Will was executed? I think it was a statutory health care power of attorney, so it would be both. Okay. But regardless, the health care power of attorney is relevant to a few different issues. Only the judge decided the breach of fiduciary duty in wrongful death claims. That doesn't mean that the Power of Attorney shouldn't have been allowed to at least be mentioned in front of the jury to demonstrate what Butch's mental state was on the day that he killed himself. It's not one piece of evidence that is determinative. It's the totality of the circumstances and the fact that he did multiple things on the same day during a time when he was mentally distressed. He had a number of friends who were worried about him, were concerned about him, were concerned he would do something terrible. These documents are executed on the same day, and then the jury can't hear about the Power of Attorney. Even notwithstanding the evidence that was allowed to be – or, I'm sorry, the evidence that was excluded from the jury, we suggest to the court that the jury verdict was against the manifest way of the evidence. The evidence and testimony from the friends, particularly Amanda Horkey and Roxanne Hancock, all demonstrated that Butch had been depressed, distraught. He was drinking excessively. He wasn't himself. He was depressed about this breakup with his girlfriend. He was depressed about the business. Notwithstanding all of that, though, this was a man that had a big support system. This was something he should have been able to overcome. He really, when it comes down to it, didn't have a reason to kill himself, despite the fact that there were bad things in his life. And we think that that evidence demonstrates that – his ultimate suicide demonstrates that he lacked the mental capacity that was required several days beforehand to create this will. So we ask that the court reverse the judgment of the trial court and ask for judgment in favor of the petitioners and the plaintiffs on the will of contest action and on the wrongful death of Ruth Breed, to produce jury duty claims. Alternatively, we would ask that the case be remitted for a second trial. Thank you. Mr. Foreman, when you're ready. Thank you. If I may, please support the counsel. Yeah, I'm John Foreman. I represent the estate and the executor in this case. And much of what you just heard was not supported in the trial court by any author's approval. There were a lot of facts that were just discussed before you by counsel, and much of it is something that should not be before you because it was weighed by not bringing it up or presenting testimony out of the hearing of the jury to preserve for appeal. The one important thing I think the counsel mentioned is, or didn't mention, is that Mr. Takiam was not part of the narrative that she gave us as of the night of this gentleman's death. Yet, a wrongful death case was filed against him, notwithstanding the statute that actually gives immunity to health care powers of attorney for inaction under their health care power of attorney. The idea that a person who wasn't present at the time that this gentleman was going back and forth to the bars and playing with guns, things of this nature, the idea that that person could be held to some fiduciary duty to prevent this suicide that he had no idea was about to take place, I think that that is something that this court should accept the trial court's ruling on, the directed verdict on that wrongful death case. When we get to some of the other issues, such as Dr. Gelbort, again, there was a motion in the minute file, it was argued, Dr. Gelbort actually was allowed to testify as to what he would say at trial by Judge Petrigaro, so she had the benefit of hearing all the things that Dr. Gelbort would say. The problem is, again, that the case law suggests that in order to give a medical opinion about someone, you need to have seen them recently. Here we have a 20-year gap. Another issue, as pointed out in my brief, and again pointed out at trial, is that he was relying upon anecdotal evidence from people who were going to discuss with him direct conversations that they had with the decedent, even though they were interested parties under the will. And that goes back to the Deadman's Act, that I think makes up most of the appellant's issues with the case. They feel that they should have been able to discuss their conversations with the decedent in open court, in front of the jury. We have a Deadman's Act for that very reason. And I made the motion, the motion was granted. Any time that there were any sort of issues that came up, objections were made by the appellees here. With regard to the Deadman's Act, when you have the executor wanting to be put on the stand, but not being put on the stand, again, that's a waiver. You've got to put the person on the stand or you actually have to offer, proffer, some sort of evidence that that person would discuss. In front of the jury. Again, I think that that's one of the main issues with the appeal here, by the appellant, is that there are insufficient offers of proof in order to support their appeal. Going back a little bit, I want to just discuss that with Gelford again. Counsel mentioned that the medical opinion witnesses can discuss matters and opinions based upon hearsay or matters that may not already be, or matters that may not be visible on evidence. That's our Wilson v. Clark matter. But we have a case right on point that is discussed in my brief, and that case looks at the anecdotal evidence that we sought to have barred, the anecdotal evidence from interested persons that Mr. Hoyt, because he's deceased, could not go back in front of a jury and say, you know what, that's not actually correct. It was 20 years ago, things that you're talking about aren't actually what I remember. That's the reason for the dead man's act, is because that person that they're talking about does not have an opportunity to come in and actually explain what his point of view is. And that is much of what I think the appellant's problem with the verdict and the court's directed verdict as well, the jury verdict and the directed verdict. The, again, the term fiduciary is something that I get from the briefing that is important. They wanted to add this term fiduciary in there so that they could try to affect the jury's mindset that, hey, this man had a duty that was over and above any duty that I may have, you know, not to act negligently while driving a car or whatever. This guy had some special duty. The evidence did not bear him out at trial. In order to propound these issues, you actually have to have evidence that bears it out. In this case, going back through the record, I think that I saw and I think that you will see as well if you have a chance to go back through the record, none of this evidence was presented. I think that the idea that the jury made a bad decision, again, I have not seen any evidence that lies in the standard of review that there needs to be. There is enough evidence to make it more probably true than not the jury found that this was this man's will. This man made his will, wanted his best friend, Jim Tapia, to take under it because he and his counselor had mentioned he had just broken up with his girlfriend, he was losing some of his business, and he made the decision, I'm going to change my will. The jury respected that decision and found in favor of the will as opposed to any contestant. If there are any questions that you may have, we'll come back to you. Thank you. Thank you. Ms. Preston? Yes, thank you again, Your Honor. Just a couple of responses to issues raised by the respondent. I spoke about the justice case earlier. He referenced it again. I don't believe that the holding in that case is exactly as the respondent indicates that it would be. It's clear in that case, and the Court actually refers to the fact that the opinion of the expert in that case was based only on the information provided by the family. And as I said earlier, that's not what we have in this case. And when evaluating whether an expert witness should be allowed to testify and to what extent he should be allowed to testify, the courts look at a totality of the circumstances when evaluating that testimony, and that is explained in the Soto v. Gaten case that's cited by the respondent in his brief. The Court lists a number of factors, and this involves the time at which the person was examined by the treating physician in that case. And in that case, there's an analysis of the facts, and factors to examine include the time at which the person was examined and the injury itself. For example, if there was an accident and somebody lost their hand, clearly an expert would be able to testify that that's a permanent injury regardless of when the injury occurred. There are certain injuries that simply don't heal, and in Dr. Galbort's opinion, the injury that was sustained by Mr. Hoyt was one of those injuries. Additionally, the information from the family, the anecdotal evidence, simply backed up the opinions that Dr. Galbort already had regarding Mr. Hoyt. His opinions were not in and of themselves based on those opinions. The petitioners made no attempt to introduce to the Court the specific information relayed by the family to Dr. Galbort. We didn't attempt to call Dr. Galbort to say, here is what the family told me. We only called him for purposes of relaying his opinions which were in part based on that testimony. As far as Mr. Takia's fiduciary duty goes, the jury was not deciding whether he breached that fiduciary duty. The jury was deciding in part whether Mr. Hoyt had the capacity to break the will at the time the will was made and whether Mr. Takia exercised any undue influence on Mr. Hoyt. Whether he had a fiduciary duty that he may have breached under the health care power of attorney was something that only the judge was to decide. However, that's information that would have been useful to the jury to know and to understand in determining what Mr. Hoyt's mental state was at the time the power of attorney was executed, which was the same thing that the will was executed. So excluding it from the jury seems to be an improper decision when the judge was going to be the one to decide whether Mr. Takia had obligations to Mr. Hoyt under the power of attorney. And our argument was not regarding the case that was decided by the judge. Can you clarify what obligations you're arguing he had? So he was appointed within a day or two? About four days, yes. Okay, so whatever fiduciary duty existed, assuming for the sake of our argument, it existed. Yes. It was only four days duration. Yes. Tell me what he should have done in those four days. Well, during that time and in the time beforehand, Mr. Takia was aware that Butch's mental state was deteriorating. Mr. Takia's testimony that we were not allowed to present to the jury had been that he was concerned that Butch was going to kill himself. He told the police officer he was worried he was going to do something horrible. But there were a lot of family members that had the same concerns and did nothing in the lead-up time. So you're saying a fiduciary duty existed before he became the health care power of attorney? I think there were factors that, in this post-violence claim, there were certainly questions as to the extent of the relationship between Mr. Hoyt and Mr. Takia, how close they were, and whether Takia was in a position to take advantage of Mr. Hoyt's declining mental state. However, on that date that he executed the health care power of attorney, he also knows the contents of the will. He indicates that he'll act as Butch's power of attorney under the health care power of attorney. As of the date that he's concerned that Butch might hurt himself or might kill himself, I think at that time he's accepting an obligation to try to assist Mr. Hoyt in obtaining some sort of medical intervention. He does nothing. It may be a short amount of time, but there's nothing to suggest Mr. Takia made any attempts to even suggest that he go to a counselor or talk to somebody. The fact that the family members who knew him just as well, I think his brother had a good relationship with him, did nothing either. They could have petitioned for guardianship of a disabled adult as well. They should have asked him to help in voluntary admission as well. True, but they are missing some of the key information. They didn't know that Butch had changed his will. At the time, though, before he changed his will, they were going to take under that will. We don't know. Nobody knows the contents of the will. Our position is that Ray would be the only living family member. Okay. I thought that there was testimony in Mr. Takia's deposition that the decedent said he was changing his will to remove Louise, which they had broken up in July about six, seven weeks maybe before. And that seems to be the thing, that he was changing his will to get rid of her, to make sure she didn't get anything. That is what Mr. Takia said. But apparently Mr. Takia destroyed that will prior to trial, so that was never available to any of the parties. So we don't actually know what the will said, and we don't really know why Butch changed it. Other than we know that Takia took the majority of the property under the will. He was advised of that. He knew he had a health care power of attorney. What's the point of accepting a health care power of attorney when you're concerned your friend is suicidal if you're not going to do anything to intervene? Thank you for answering our question. And again, I would ask that the judge and the trial court and the judge that mentioned in the paper find time as well to explain each trial. Thank you. We are going to stand in recess. I think for a lunch break, are we at that point in time? Hopefully we'll be taking a matter under advisement. We'll be conferring with our respected colleague, Justice McDade, and I'll do delay rendering and decision in this case.